**MEDTRONIC, INC. and Medtronic Puerto Rico, Inc., Plaintiffs,**

v.

**TELECTRONICS, INC., Defendant.**

Civ. A. No. 86–M–2077.

United States District Court, D. Colorado.

Nov. 27, 1987.

---

Edwin S. Kahn, Kelly Haglund Garnsey & Kahn, Denver, Colo., Robert T. Edell, Albert L. Underhill, Merchant, Gould, Smith, Edell, Welter & Schmidt, Joseph F. Breimayer, Medtronic, Inc., Minneapolis, Minn., for plaintiffs.

Peter L. Edwards, Rothgerber, Appel, Powers & Johnson, Englewood, Colo., Michael I. Rackman, Barry A. Cooper, Jeffrey M. Kaden, Gottlieb, Rackman & Reisman, Robert R. Salman, Reavis & McGrath, New York City, William C. Nealon, Suffield, Conn., for defendant.

## MEMORANDUM OPINION AND ORDER

MATSCH, District Judge.

The plaintiffs, Medtronic, Inc. and Medtronic Puerto Rico, Inc. (Medtronic), initiated this action for patent infringement against Telectronics, Inc. on October 3, 1986. The suit is based on Patent No. 3,902,501 (the '501 patent). Claim 1 of the patent describes a heart pacemaker lead with "tine means" made of a nonconducting material such as silicone rubber. These tine means extend away from the tip of the lead at a generally acute angle and are made of a "pliant material having sufficient rigidity to maintain said angle when said tine means are unrestrained, but sufficiently pliant to prevent penetration of said heart tissue." United States Patent No. 3,902,501 (Exhibit 1 to Plaintiffs' motion for Preliminary Injunction).

The plaintiffs claim that the defendant is selling a variety of leads which fall within the claims of the '501 patent. Contemporaneously with the filing of the complaint, the plaintiffs filed a motion for a preliminary injunction to enjoin the defendant from further sales of the allegedly infringing leads.

A hearing was held on December 11, 1986. The plaintiffs then urged this court to grant the motion based on the briefs and affidavits, proceeding as if on a motion for summary judgment under F.R.Civ.P. 56. Additional briefs and documents were submitted by both parties after the hearing. The defendant filed a motion for summary judgment of invalidity of the patent and both parties have filed briefs on that motion.

*Amoco Oil v. Rainbow Snow,* 748 F.2d 556 (10th Cir.1984), sets forth the requirements for a preliminary injunction:

> [i]n order for a preliminary injunction to issue, the moving party has the burden of establishing:
>
> (1) substantial likelihood that the movant will eventually prevail on the merits; (2) a showing that the movant will suffer irreparable injury unless the injunction issues; (3) proof that the threatened injury to the movant outweighs whatever damage the proposed injunction may cause the opposing party; and (4) a showing that the injunction, if issued, would not be adverse to the public interest.

*Id.* at 557.

### Substantial Likelihood of Prevailing on the Merits

To establish a likelihood of success on the merits the plaintiffs must "clearly

show" that the patent is both valid and infringed by the defendant's tined leads. *Atlas Powder Co. v. Ireco Chemicals,* 773 F.2d 1230, 1233 (Fed.Cir.1985). The defendant contests both the validity of the '501 patent and whether its own leads infringe.

*Validity*

 Medtronic's arguments concerning the validity of the '501 patent are largely based on the fact that this patent has been found valid in several previous cases affirmed by the Court of Appeals for the Federal Circuit. In the District of Minnesota the presiding judge found the patent "valid beyond question" in granting a preliminary injunction against the Daig Corporation. *Medtronic, Inc. v. Daig Corporation,* 221 U.S.P.Q. 595 (D.Minn.1983). The patent was later found valid by a second judge in the same litigation after a full trial on the merits. *Medtronic, Inc. v. Daig Corporation,* 611 F.Supp. 1498 (D.Minn. 1985), *aff'd, Medtronic, Inc. v. Daig Corp.,* 789 F.2d 903 (Fed.Cir.1986), *cert. den.,* —— U.S. ——, 107 S.Ct. 402, 93 L.Ed.2d 355 (1986). Medtronic also refers to a jury verdict finding the '501 patent valid, and affirmance in *Medtronic, Inc. v. Intermedics, Inc.,* 799 F.2d 734 (Fed.Cir.1986).

All patents receive the benefit of a statutory presumption of validity. 35 U.S.C. § 282. The prior adjudications of validity reinforce the presumption and serve as evidence supporting the plaintiffs' burden of a clear showing of likelihood of success on the issue of validity. *Atlas Powder,* 773 F.2d at 1232. Some courts have said that validity is established "beyond question" for purposes of a preliminary injunction when "the patent has been previously adjudicated valid." *Rohm & Haas Co. v. Mobil Oil Corp.,* 525 F.Supp. 1298, 1303 (citing *Mayview Corp. v. Rodstein,* 480 F.2d 714, 717 (9th Cir.1973)).

The defendant has, however, made substantial arguments against validity. The defendant's invalidity argument can essentially be reduced to the following: the combination of three prior art references made the '501 patent obvious at the time it was invented and it is thus invalid under 35 U.S.C. § 103. The first prior art reference on which the defendant relies is a 1969 article in Bio–Medical Engineering describing a lead designed by the Vitatron Corporation. This lead was described as having a "small barbed silicone ring to prevent dislocation in the critical postoperative period."

The description says nothing about the configuration or other characteristics of the barbed ring. The district court in *Medtronic v. Daig,* 611 F.Supp. 1498, concluded that the reference was "ambiguous" and that "the phrase 'a small barbed silicone ring' alone discloses simply three adjectives loosely modifying a solitary noun. Read literally, the phrase describes a ring which is small, which is barbed, and which is silicone. The elements of Claim 1 are not apparent in this phrase." *Id.* at 1510.

Telectronics argues that the Minnesota court erred as a matter of law in looking at pictures to clarify the meaning of the phrase and then finding that the lead in question actually had a "flange or wedge tip." *Id.*

The defendant also relies on a 1972 Vitatron brochure depicting a lead with four wires (or tines, as the defendant characterizes them) protruding from the electrode tip (Exhibit T to the Affidavit of William T. Nealon, Defendant's Brief in Opposition to the Motion for Preliminary Injunction). These tines do not extend rearwardly from the tip at an acute angle as is claimed in the '501 patent and appear to function by "actively" (through penetration) attaching the lead to heart tissue.

The defendant, however, does point out that the wires are specifically described as being made of a nonconducting material (nylon) so that they "cause little tissue reaction and do not pass metal-ions into solution." (Defendant's Exhibit T, Nealon Affidavit). Thus, the defendant argues, this prior art reference makes obvious the portion of claim 1 of the '501 patent which describes the use of "nonconducting tine means" composed of a "material being generally inert to body fluids." '501 Patent, Exhibit 1 to Plaintiffs' Brief.

The plaintiffs argue in response that it is not even clear that this Vitatron brochure constitutes prior art. They allege that the date of invention for the '501 patent was July 7, 1972. The Vitatron reference cited by the defendant, however, is only identified as having been published in 1972. If the publication date was subsequent to the date of invention this reference would not be a part of the prior art at all and then even the "nonconducting material" element of claim 1 would not have been obvious.

Even if this reference does constitute prior art, however, it alone clearly does not make all of the elements of claim 1 of the '501 patent obvious. The reference teaches the use of an "active" means of securing the lead to the heart tissue. The nylon wires were specifically intended to penetrate heart tissue to hold the lead in place. In contrast, claim 1 of the '501 patent describes a method of "passive" fixation, where the tines "cooperate" with heart tissue to hold the tip in position without penetrating.

In an attempt to avoid this problem with the 1972 Vitatron reference the defendant argues that its teaching concerning the nonconducting material, in combination with an East German reference, identified as the Schaldach article, which described the use of wires as a form of "passive" fixation, makes all of claim 1 of the '501 patent obvious and therefore invalid.

There appear to be several fundamental differences between the hooks on the Schaldach device and the tines on the '501 patent. One basic difference is that the hooks are made of metal and are designed to function as part of the conductive surface of the lead transmitting the pacemaking pulse to the heart. In contrast, the '501 tines serve solely as a means of fixation. As such, the hooks of the Schaldach device would not seem to lead one towards the use of tines as in the '501 patent.

A second significant difference is that the wire hooks of the Schaldach device were attached to the end of the lead in a coil pattern, with the hook ends extending away from either end of the coil, whereas the tines of the '501 patent are appendages which extend from, and are a part of, the silicone outer covering of the electrode. These appendages extend away from a point adjacent to the side of the tip of the lead, rather than from a coil attached to the end of the tip. The '501 configuration does not seem to be an obvious extension of the teaching of the Schaldach device.

Finally, the rigid metal wires are quite different from pliant silicone tines. The contrast becomes apparent when withdrawal is considered. The rigid wires of the Schaldach device must be covered by a catheter before removal to prevent any damage to the heart tissue. In contrast, the '501 patent features tines made of a material sufficiently pliant to prevent penetration of heart tissue during removal.

The defendant moved for summary judgment, alleging that the critical claim of the patent is invalid for several reasons because it introduces "new matter" that was not initially described in the "statement of invention" and that claim 1 is therefore invalid under 35 U.S.C. § 112. It also argues that, even if there is support in the statement of invention for this new matter, it was not sufficiently claimed initially and therefore a supplemental oath should have been filed under 37 C.F.R. § 1.67.

The specific language of claim 1 which the defendant asserts constitutes new matter, or at least requires a supplemental oath, is that portion which states that the tines are "sufficiently pliant to prevent penetration of said heart tissue." This language was not included in claim 1 as it was originally filed. Instead, it was added as an amendment by the Patent Examiner to render claim 1 "complete and definite under § 112." *Medtronic, Inc. v. Daig Corp.*, 221 U.S.P.Q. 595, 600 (D.Minn.1983).

The defendant argues that "[i]t is nothing short of incredible that there is not one word in the description of the '501 patent ... about the prevention of penetration of heart tissue." Defendant's Brief in Support of Summary Judgment, p. 5.

The plaintiffs, however, argue that there was sufficient disclosure in the original description of the patent to cover the asser-

tion of claim 1 that penetration is prevented. They also note that the judge who held the preliminary injunction hearing in *Medtronic v. Daig* (which considered the validity of the same patent), explicitly held that "the elements of Claim 1 of the '501 Patent find support and correspondence in the structure disclosed and described in the '501 Patent." *Medtronic v. Daig*, 221 U.S.P.Q. at 601. On the basis of this prior finding, as well as certain specific language in the patent specification, the plaintiffs argue that this motion should be denied.

The "party asserting invalidity based on 35 U.S.C. § 112 bears no less a burden and no fewer responsibilities than any other patent challenger." *Ralston Purina Co. v. Far–Mar–Co, Inc.*, 772 F.2d 1570, 1574 (Fed.Cir.1985). The burden of proof is to show "by clear and convincing evidence" that the patent is invalid. *Id.* Obviously, an additional hurdle confronting the defendant is that this is a motion for summary judgment and therefore it must show that there are no genuine issues of material fact. *Adickes v. Kress & Co.*, 398 U.S. 144, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970). Furthermore, all evidence must be viewed in a light most favorable to the plaintiff. *D.L. Auld Co. v. Chroma Graphics Corp.*, 714 F.2d 1144 (Fed.Cir.1983).

The cases all agree that "the inquiry into whether the description requirement [of § 112] is met is a question of fact." *In re Wilder*, 736 F.2d 1516, 1520 (Fed.Cir.1984), *cert. den.*, 469 U.S. 1209, 105 S.Ct. 1173, 84 L.Ed.2d 323; *Ralston Purina*, 772 F.2d at 1574. Furthermore, the question of "[p]recisely how close the original description must come [to what is later claimed] to comply with the description requirement of 35 U.S.C. § 112 must be determined on a case-by-case basis." *Ralston Purina*, 772 F.2d at 1575.

The *Wilder* case sets forth the test for determining whether the disclosure requirements of section 112 have been met. It states that "[i]t is not necessary that the claimed subject matter be described identically [in the disclosure], but the disclosure originally filed must convey to those skilled in the art that [the] applicant has invented

the subject matter claimed." *Wilder*, 736 F.2d at 1520. *Ralston Purina* states the test as a requirement that "the disclosure of the application relied upon [by the patentee] 'reasonably conveys to the artisan that the inventor had possession at that time of the later claimed subject matter.'" *Ralston Purina*, 772 F.2d at 1575, (citing *In re Wilder*).

■ At least with the state of the evidence as presented by the parties thus far, it does not appear that this test can be fully evaluated and all factual questions resolved at this preliminary stage. There has been absolutely no evidence presented as to what constitutes a person "skilled in the art." Furthermore, the parties are in sharp dispute as to whether the description contains sufficient disclosure to convey to such a person whether the inventor did possess at the time of application the disputed subject matter of claim 1. Since the required test cannot be resolved without answering these questions, it seems clear that summary judgment would be improper.

The defendant, although mentioning this test in its opening brief, largely ignores it. Instead it claims that there are no facts in dispute and then sets forth three separate arguments to support this assertion. It first argues that at best the disclosures of the patent description allow an inference that the prior art pacemaker leads perforated the heart *wall* and that claim 1 asserts that the '501 patent will not even penetrate heart *tissue* (not even the trabeculae). The defendant then spends numerous pages of its opening and reply briefs arguing that there is a fundamental difference between penetration of heart tissue and perforation of the heart wall. This, however, seems to be a question of fact which cannot properly be determined on a motion for summary judgment.

The defendant argues that these differences have been admitted in a deposition by an expert witness of the plaintiffs', Kenneth B. Stokes, and also by the plaintiffs' counsel at the same deposition. The plaintiffs, however, dispute the import of these "admissions" and also argue that Stokes is

not an expert on the '501 patent or patent interpretation, and is therefore not competent to testify on these matters or make any such admissions. These assertions, as well, appear to present substantial factual questions.

The defendant's second argument is based on another distinction between the language of the '501 patent description and that in claim 1. Claim 1 states that the tines are "sufficiently pliant to *prevent* penetration of said heart tissue." The language of the patent description, however, states only that there was a *possibility* of perforation with the prior art leads. The defendant then says that to prevent penetration is something far more restrictive than to lessen the possibility of perforation.

While this may be true it does not seem to entitle the defendant to summary judgment. There is still a question of fact whether the language of the patent description contains sufficient disclosures to inform a person skilled in the art that penetration prevention was originally part of the invention which became the '501 patent.

This also appears to be the answer to the defendant's third contention. In a supplemental brief, the defendant argues that there is a fundamental distinction between *perforation* of the heart wall (which the prior art leads were described as doing) and *penetration* of heart tissue, which claim 1 asserts is prevented by the '501 patent. The defendant claims that to perforate requires that the tine in question not just enter the heart wall or tissue, but it must in addition go all the way through it. To penetrate, however, the plaintiff maintains, the tine need only enter, but not go all the way through the tissue.

■ As for the supplemental oath argument, it does not appear to be any more ripe for resolution than the new matter argument. The supplemental oath requirement is apparently only triggered when there is some disclosure in the patent description sufficient to prevent a finding of invalidity based on new matter, but not enough to fully cover the later added claim language. Thus, it appears to be an intermediate way of finding invalidity for insufficient disclosure; one which is only triggered when the new matter argument fails. In any event, however, it appears to be just as much a fact question as the new matter argument.

The requirement of a supplemental oath is found in 37 C.F.R. § 1.67, which states that "[a] supplemental oath ... must be filed: (1) When a claim is presented for matter originally shown or described but not substantially embraced in the statement of invention or claims originally presented...." Here again, it seems clear that a question of fact exists as to whether the original statement of invention sufficiently embraced the amended claims. None of the evidence presented by the defendant is any more compelling or decisive on this issue than it was on the new matter issue.

The defendant's motion for summary judgment of invalidity must be denied.

*Infringement*

The plaintiffs submit the affidavit of an expert, Donald W. Banner, the former United States Commissioner of Patents and Trademarks, which sets forth his opinion that four specific models of tined leads sold by the defendant do, in fact, infringe the '501 patent. A supplementary affidavit by Mr. Banner sets forth his opinion as to an additional six leads, which, he concludes, also infringe the '501 patent.

The Motion for Preliminary Injunction, however, lists eighteen different lead models as infringing the patent. The plaintiffs have only presented evidence of infringement by the ten models which the affidavits specifically identify and thus, on the present record, only production or sale of those ten could be enjoined.

■ As for these ten, Telectronics argues that they do not actually infringe the '501 patent because their tines are not "adjacent" the tip of the electrode, as described in claim 1 of the '501 patent, but are intentionally set back near the rear of their leads to avoid infringement.

While the plaintiffs have supplied pictures of the allegedly infringing leads, and both sides rely on them in support of their

arguments, no scale is provided to gauge how far the tines actually are from the tip. Nevertheless, it does not appear that the tines on Telectronics' leads are so far away from the tip that they could not be considered to be "adjacent." The Random House College Dictionary defines adjacent as "near or close; next or contiguous." A review of the pictures of Telectronics' leads supplied by the plaintiffs shows the tines near enough to the end of the lead that they could come within this dictionary definition. This would then lead to a conclusion that Telectronics' leads literally infringe the '501 patent.

It seems likely that even if the Telectronics leads do not literally infringe the '501 patent, infringement would be found under the doctrine of equivalents. The test for a finding of equivalence is that the allegedly infringing item and the patented invention must "perform substantially the same function in substantially the same way to give substantially the same result." *Loctite Corp. v. Ultraseal Ltd.*, 781 F.2d 861, 869 (Fed.Cir.1985).

The tines of Telectronics' leads appear to perform substantially the same function in substantially the same way and give substantially the same result as those claimed in the '501 patent. Although the tines of the Telectronics leads are set slightly further back from the tip than are those shown in the drawing accompanying the '501 patent, they are present for the very same purpose. In both cases, the tines are meant to hold the lead in its proper place in the heart (by engaging the trabeculae) without penetrating the heart tissue. They are constructed of a non-conducting material that is sufficiently pliant to allow easy and safe insertion and removal and yet rigid enough to keep the lead in place when unrestrained.

In addition, the word adjacent, as used in claim 1 of the '501 patent, seems to have been used merely as a general descriptive term, rather than a functional term. Thus, the function to be compared has little to do with the relatively minor differences of location of the tines and much more to do with the angle at which they lie in relation

to the body of their respective leads and their construction from a non-conducting and pliant material. These last two attributes supply the key functional characteristics that must be compared under the doctrine of equivalents.

The plaintiffs have made a showing that they are likely to succeed on the question of infringement.

*Misuse*

The defendant also resists the motion on claims of patent misuse. It contends that Medtronic attempted a tying arrangement, conditioning a license under the '501 patent on acceptance of licenses for less valuable patents. The defendant also asserts that Medtronic has made an illegal attempt to monopolize the market for pacemaker leads.

The defendant has failed to make a strong showing on either of these two affirmative defenses.

*Irreparable Injury*

The plaintiffs make much of the rule that "where validity and continuing infringement have been clearly established ... immediate irreparable harm is presumed." *Smith International, Inc. v. Hughes Tool Co.*, 718 F.2d 1573, 1581 (Fed.Cir.1983), cert. den. 464 U.S. 996, 104 S.Ct. 493, 78 L.Ed.2d 687 (1984). The defendant, in turn, attempts to distinguish *Smith International* on the basis of the fact that the prior adjudication relied upon to establish validity and continuing infringement involved both the same plaintiff and the same defendant. Since the prior adjudications of validity relied on by the plaintiffs in this case involved other defendants, Telectronics argues it should not be subject to *Smith International's* presumption of irreparable harm.

■ This argument, however, fails to acknowledge the holding of *Atlas Powder Co. v. Ireco Chemicals*, 773 F.2d 1230 (Fed.Cir.1983), that, "the patent need not be adjudicated in a prior litigation between the same parties." *Id.* at 1232. Although not as binding as a finding of validity and infringement against Telectronics itself, the several prior adjudications of validity of

the '501 patent, together with the evidence of infringement, constitute a strong showing of likelihood of success on these issues, entitling the plaintiffs to a presumption of irreparable harm.

Nevertheless, the Federal Circuit has held that:

> [t]he presumption [of irreparable harm] does not change the ultimate equitable showing needed to justify a preliminary injunction. Like most legal presumptions, it is rebuttable by clear evidence that it is overcome in the case at hand. The presumption merely requires that an alleged infringer confronted by a patentee's strong showing of validity and infringement bring forward evidence that irreparable injury would not actually be suffered by the patentee if the motion for preliminary injunction were denied.

*Roper Corp. v. Litton Systems, Inc.*, 757 F.2d 1266 (Fed.Cir.1985).

Telectronics makes several arguments to rebut this presumption. The first is that since the plaintiffs presently have license agreements for the '501 patent with three other companies, an established royalty exists and the plaintiffs can thus be adequately compensated in money damages if they should prevail at trial. The second is based on the fact that there was a delay of more than five years after the plaintiffs were aware of the defendant's sales of allegedly infringing leads before this suit was filed and a preliminary injunction was sought.

The defendant's established royalty theory suffers from two major flaws. First, the three licenses in existence for the '501 patent do not constitute an established royalty. In *Hanson v. Alpine Valley Ski Area, Inc.*, 718 F.2d 1075 (Fed.Cir. 1983), the court stated that " 'a single licensing agreement does not generally demonstrate uniformity nor acquiescence in the reasonableness of the royalty rate.' For a royalty to be 'established,' it 'must be paid by such a number of persons as to indicate a general acquiescence in its reasonableness by those who have occasion to use the invention.' " *Id.* at 1078 (citations omitted).

While there are three licensing agreements involving the '501 patent, rather than just a single one as in *Hanson*, these three are not enough to show a "general acquiescence" in the rate being paid. This is especially true in light of the fact that at least two of these agreements were the result of settlements of litigation over alleged infringement of the '501 patent by the licensed party. Plaintiff's Reply Brief, p. 7. A settlement of litigation may involve other factors than would be involved in an arms length negotiation to establish a royalty. The plaintiffs and defendant, moreover, engaged in a long period of negotiations in an attempt to establish a royalty prior to the initiation of this litigation and yet could not come to terms. This is further evidence that there is no "general acquiescence" in the rate to be paid.

The second problem with the defendant's argument is the fact that the Federal Circuit has on several occasions criticized just such reasoning. In *Atlas Powder Co. v. Ireco Chemicals*, 773 F.2d 1230 (Fed.Cir. 1985), the court stated that:

> [the defendant's] arguments that infringement and related damages are fully compensable in money downplay the nature of the statutory right to exclude others from making, using, or selling the patented invention throughout the United States. While monetary relief is often the sole remedy for past infringement, it does not follow that a money award is also the sole remedy against future infringement. The patent statute further provides injunctive relief to preserve the legal interests of the parties *against future infringement* which may have market effects never fully compensable in money.

*Id.* at 1233 (emphasis in original; citation omitted). The Federal Circuit has also recently stated that "[t]he nature of the patent grant thus weighs against holding that monetary damages will always suffice to make the patentee whole, for the principal value of a patent is its statutory right to exclude." *H.H. Robertson, Co. v. United Steel Deck, Inc.*, 820 F.2d 384, 390 (Fed.Cir. 1987).

The defendant has argued that the fact that the plaintiffs did not bring the three license agreements to the attention of the court constitutes a fraud on the court. In light of the conclusion that these licenses do not constitute an established royalty, the failure of the plaintiffs to bring them to the attention of the court in their opening brief does not constitute a fraud on the court.

The second argument advanced by the defendant in an attempt to rebut the presumption of irreparable harm is that the plaintiffs have shown, by their long delay in filing this action and requesting preliminary relief that they are not, in fact, being irreparably harmed. This argument is primarily based on a Tenth Circuit case which has held that:

> [d]elay in seeking relief ... undercuts any presumption that infringement alone has caused irreparable harm *pendente lite;* therefore such delay may justify denial of a preliminary injunction for trademark infringement.... Delay of [nearly a year] undercuts the sense of urgency that ordinarily accompanies a motion for preliminary relief and suggests that there is, in fact, no irreparable injury.

*GTE Corp. v. Williams,* 731 F.2d 676 (10th Cir.1984). Although this case was a trademark infringement action, its holding has been adopted in a patent setting in *Rexnord, Inc. v. Laitram Corp.,* 628 F.Supp. 467 (E.D.Wis.1986). While this theory has not been considered by the Federal Circuit in a patent case, that court originally borrowed its presumption of irreparable harm upon a clear showing of validity and infringement from copyright cases, *Smith International, Inc. v. Hughes Tool Co.,* 718 F.2d 1573 (Fed.Cir.1983), and it has also stated that "[t]he burden on the movant [for a preliminary injunction] should be no different in a patent case than for other kinds of intellectual property ..." *Atlas Powder Co.,* 773 F.2d at 1233. Obviously, part of the movant's burden is to establish that it will be irreparably harmed in the absence of an injunction, and a test that applies to deny an injunction due to undue

delay in the trademark context should also be applicable in a patent case.

Thus, the question becomes whether the delay alleged in this case was long enough and so without excuse that it can constitute the "clear evidence" required to rebut the presumption of irreparable harm to which the plaintiffs in this case would otherwise be entitled. *Roper v. Litton,* 757 F.2d at 1272.

Telectronics alleges that Medtronic has known, since at least 1981, of its sales of the tined leads which Medtronic now claims infringe the '501 patent. Medtronic does not dispute this allegation. This appears to be an extraordinarily long time to wait before seeking preliminary relief.

The third element of the test for a preliminary injunction is a balancing of the hardship imposed on the defendant if the injunction were to issue and the hardship imposed on the plaintiffs if it should be denied. The plaintiffs, apparently resting on their presumption of irreparable harm, have not presented any independent evidence of injury they would suffer if their motion for a preliminary injunction is denied. Instead, they merely argue that because the defendants have been aware of their alleged infringement since at least 1981, and that the plaintiffs were actively pursuing other infringers in separate actions, then any hardship imposed on the defendants is the result of their continued knowing infringement and therefore should not be considered in the balance.

The defendant asserts that it would more than likely be put out of business if the injunction were imposed, since it relies on the sale of tined leads to support its pacemaker business. Affidavit of James Loughman, ¶ 8. It also argues that Medtronic would not be harmed since it could collect royalties if it prevails at trial.

Traditionally, the public interest element of the preliminary injunction test has, in the patent context, been answered by statements such as "public policy favors protection of the rights secured by valid patents." *Smith International, Inc.,* 718 F.2d at 1581. While this is true in general, other factors can be considered in a given case.

847

In this case, for instance, the defendant's claim that its business would be destroyed may weigh in favor of a denial of the motion if it is supported by sufficient evidence presented at trial.

The issues of irreparable harm and the public interest must be evaluated in the larger context of the relationship of the parties before this court. They are competitors in the market for pacemakers in the United States and in other countries. On November 23, 1983, Telectronics filed a declaratory judgment action in the United States District Court for the Southern District of New York, *Telectronics Proprietary, Inc. v. Medtronic, Inc.*, Civil Action No. 83 Civ. 8568 (CSH), alleging the invalidity of three Medtronic patents and that a fourth was not infringed. These patents are involved in dual-chamber pacemakers. Medtronic counterclaimed for infringement and Telectronics filed supplemental complaints alleging antitrust violations, similar to those asserted in this lawsuit. Medtronic moved to dismiss or transfer those counterclaims to New York. Extensive discovery has gone on in both districts. These same parties have been involved in litigation over patents in France. Finally, the defendant has filed a counterclaim for infringement of its Patent No. 3,903,897.

It is this court's conclusion that given the ongoing legal and economic struggle between the parties to this lawsuit, it would be imprudent and irresponsible to separate out the issues raised by the plaintiffs' motion for preliminary injunction. That is an equitable remedy and the balancing of equities cannot be accomplished on this limited record. Moreover, the form and scope of a preliminary injunction and the conditions under which it may be entered, including the amount of a required bond, would necessitate extensive evidentiary hearings. On balance, the court concludes that the question of injunctive relief must be deferred until trial on the merits.

Accordingly, it is

ORDERED, that plaintiffs' motion for preliminary injunction and defendant's motion for summary judgment are denied, and it is

FURTHER ORDERED, that, pursuant to Rule 16(b) of the F.R.Civ.P., a scheduling conference shall be convened to develop a scheduling order. Counsel for the parties shall appear in Courtroom A, Second Floor, Post Office Building, 18th and Stout Streets, Denver, Colorado, on Friday, January 22, 1988 at 8:00 a.m. for the purpose of such a conference. Counsel are directed to meet before this conference to attempt to agree upon a scheduling order to submit for the Court's approval. It is

FURTHER ORDERED, that a hearing will be held on the plaintiff's motion for contempt and sanctions on the same date and time as the scheduling conference.

COUNSEL RESPONSIBLE FOR THE TRIAL OF THIS CASE MUST BE PRESENT.