**NTP, INC., Plaintiff.**

v.

**RESEARCH IN MOTION, LTD., Defendant.**

**No. 01–CV–767.**

United States District Court, E.D. Virginia, Richmond Division.

May 23, 2003.

See also 2003 WL 21252019.

Jack Edward McClard, Maya Miriam Eckstein, Hunton & Williams, Richmond, VA, John Benedict Wyss, Floyd Brantlet Chapman, Scott Eric Bain, James Harold Wallace, Jr., Wiley Rein & Fielding LLP, Washington, DC, Christopher Michael Mills, Wiley Rein & Fielding LLP, McLean, VA, for Plaintiff.

Stephen Earl Baril, Williams Mullen PC, Richmond, VA, Thomas Robert Goots, Robert Conley Kahrl, Robert Louis Canala, Kenneth Robert Adamo, Jones Day, Cleveland, OH, Donald Belton Ayer, Charles Richard Allan Morse, Jones DAy, David Wayne Long, Howrey Simon Arnold & White LLP, Washington, DC, Henry C. Bunsow, Howrey Simon Arnold & White, San Francisco, CA, for Defendant.

## MEMORANDUM OPINION

SPENCER, District Judge.

THIS MATTER comes before the Court on Plaintiff NTP, Inc.'s ("NTP") Motion for Enhanced Damages and Attorney Fees, and NTP's Motion for Prejudgment and Postjudgment Interest, both filed on December 19, 2002. For the reasons discussed herein, Plaintiff's Motion for Enhanced Damages and Attorney Fees is GRANTED in part, and DENIED in part. As stated in this Court's March 11, 2003 Order, Plaintiff's Motion for Prejudgment and Postjudgment Interest is GRANTED.

### I.

This is a patent infringement action which involved sixteen claims of five separate patents owned by NTP. Research in Motion, Ltd. ("RIM") was found to infringe two of the sixteen claims on summary judgment. Trial commenced with respect to the remaining fourteen claims of United States Patent Nos. 5,436,960 (the '960 Patent), 5,625,670 (the '670 Patent), 5,819,172 (the '172 Patent), 6,067,451 (the '451 Patent), and 6,317,592 (the '592 Patent) (collectively, the "patents-in-suit" or "Campana Patents"). At the conclusion of the trial, the jury returned a verdict in

favor of NTP, finding that various RIM products and services infringed the Campana Patents. In addition, the jury made an express finding that RIM willfully infringed the Campana Patents.

NTP has filed a series of post-trial motions seeking enhanced damages and attorney fees, as well as prejudgment and post-judgment interest. NTP seeks treble damages and prejudgment interest calculated at the prime rate.

## II.

NTP has filed a motion requesting enhanced damages and attorney fees. NTP essentially argues that RIM's egregious conduct and the jury determination of willful infringement mandates that it be awarded treble damages and attorney fees.

### A. Enhanced Damages

■■■ Upon a finding of infringement by the jury, "the court may increase the damages up to three times the amount found" if the jury also finds that the defendant willfully infringed the patents-in-suit. 35 U.S.C. § 284; *In re Hayes Microcomputer Products, Inc. Patent Litigation*, 982 F.2d 1527, 1545 (Fed.Cir.1992). Enhanced damages not only operate as a punitive measure against individual infringing defendants, but they also serve an overarching purpose as a deterrence of patent infringement. *SRI Int'l, Inc. v. Advanced Tech. Labs., Inc.*, 127 F.3d 1462, 1468 (Fed.Cir.1997). However, these damages are not meant to compensate the plaintiff. *Delta–X Corp. v. Baker Hughes Production Tools, Inc.*, 984 F.2d 410, 413 (Fed. Cir.1993). In assessing enhanced damages, it is first necessary that the factfinder determine that the defendant is liable for willful infringement. *Transclean Corp. v. Bridgewood Servs., Inc.*, 290 F.3d 1364, 1377 (Fed.Cir.2002). Such a finding, however, does not mandate that the court award enhanced damages. *Id.* Indeed, the court must engage in a separate analysis

to determine whether the egregiousness of the defendant warrants enhanced damages, and if so, the extent of those damages. *Electro Scientific Indus., Inc. v. General Scanning, Inc.*, 247 F.3d 1341, 1353 (Fed.Cir.2001); *Jurgens v. CBK Ltd.*, 80 F.3d 1566, 1570 (Fed.Cir.1996). The decision whether to award enhanced damages is within the sound discretion of the court, *Electro Scientific*, 247 F.3d at 1353.

Although the court may award treble damages, such amount is usually warranted where the defendant's behavior is particularly egregious. *SRI Int'l*, 127 F.3d at 1469 (affirming the trebling of damages due to the infringer's "delays, silences, misinformation, non-responses, and various other means of 'putting SRI off as long as possible.' "). *But see Electro Scientific*, 247 F.3d at 1354 (affirming the district court's denial of enhanced damages based on the infringer's good faith belief that the patents-in-suit were invalid); *Virginia Panel Corp. v. MAC Panel Co.*, 133 F.3d 860, 867 (Fed.Cir.1997) (affirming enhancement of 10% where patent copying was recklessly indifferent as opposed to deliberate; the defendant conducted a "marginally sufficient" investigation of the patents; the defendant engaged in acceptable litigation behavior; the case was close; and a large enhancement could jeopardize the defendant's business).

■■■ When addressing the issue of enhanced damages, courts "must consider factors that render defendant's conduct more culpable, as well as factors that are mitigating or ameliorating." *Read Corp. v. Portec, Inc.*, 970 F.2d 816, 826 (Fed.Cir. 1992). A court is obliged to consider all relevant circumstances in reaching this determination. *Minnesota Mining and Mfg. Co. v. Johnson & Johnson Orthopaedics, Inc.*, 976 F.2d 1559, 1580 (Fed.Cir.1992). In *Read*, the Federal Circuit established that courts should consider the following

factors together in determining the degree of the infringer's culpability: (1) whether the infringer deliberately copied the ideas or design of another; (2) whether the infringer, upon notice of the other's patent protection, investigated the scope of the patent and formed a good-faith belief that it was invalid or that it was not infringed; (3) the infringer's behavior as a party to the litigation; (4) the infringer's size and financial condition; (5) the closeness of the case; (6) the duration of the infringer's misconduct; (7) any remedial action by the infringer; (8) the infringer's motivation for harm; and (9) whether the infringer attempted to conceal its misconduct. *Read,* 970 F.2d at 827. After taking all of the *Read* factors into consideration, it is clear that enhanced damages are warranted. However, RIM's behavior does not warrant treble damages.

### 1. Whether RIM Deliberately Copied

RIM asserts that this factor should mitigate enhanced damages. There is no evidence that RIM copied any of the Campana Patents. Indeed, NTP concedes this much. It is apparent that RIM developed and conceived its BlackBerry products entirely independent of the Campana patents. Therefore, the absence of copying by RIM is a mitigating factor. *See Cybor Corp. v. FAS Techs., Inc.,* 138 F.3d 1448, 1461 (Fed.Cir.1998) (affirming denial of enhanced damages due to "weak" evidence of copying); *Virginia Panel,* 133 F.3d at 867 (affirming mitigation of enhanced damages based on "reckless" as opposed to "deliberate" copying).

### 2. Sufficiency of Investigation

Possibly the most controverted issue with regards to enhanced damages is the sufficiency of RIM's investigation of the Campana Patents and whether its reliance on the oral opinion of Charles Meyer, RIM's lead in-house counsel, regarding infringement of those patents was in good faith and met RIM's duty of care. NTP is adamant that RIM's investigation was far from adequate, and as a result, RIM failed to satisfy its affirmative duty of care. RIM argues that, based on the totality of the circumstances, its investigation into the Campana Patents met its duty of care. However, RIM's argument as to the "totality of the circumstances"—namely, RIM's investigation *after* NTP filed suit—discounts the fact that NTP only asserted willfulness from the date of NTP's notice letter on January 27, 2000, to the day RIM received its oral opinion from Larry Nixon. Under these circumstances, it is more probative to evaluate RIM's actions immediately after it received the January 2000 notice letter from NTP.

Upon receiving actual notice of another's patent, a potential infringer "has an affirmative duty of care that normally requires the potential infringer to obtain competent legal advice before infringing or continuing to infringe." *Minn. Mining,* 976 F.2d at 1580. However, even if a potential infringer obtains legal advice, liability for willful infringement may still attach if that advice is not competent. *Id.* Thus, the probative question is, whether "under all the circumstances, a reasonable person would prudently conduct himself with any confidence that a court might hold the patent invalid or not infringed." *Id.* (citing *Ryco, Inc. v. Ag–Bag Corp.,* 857 F.2d 1418, 1428 (Fed. Cir.1988)). Whether an opinion is incompetent depends on an objective evaluation of the evidence. *Read,* 970 F.2d at 829. In order for an opinion to be effective and indicative of the defendant's good faith intent, it "must be premised upon the best information known to the defendant." *Comark Communications, Inc. v. Harris Corp.,* 156 F.3d 1182, 1191 (Fed.Cir.1998). For example, the Federal Circuit in *Datascope Corp. v. SMEC, Inc.,* 879 F.2d 820, 828 (Fed.Cir.1989), held that the district court's finding of good faith was clearly

erroneous where the legal opinion was conclusive, did not provide an analysis of infringement under the doctrine of equivalents, and failed to order a copy of the patent prosecution history. Furthermore, the Federal Circuit has also noted that oral opinions, especially those that are not objective, carry little weight. *Minn. Mining,* 976 F.2d at 1580 ("Such opinions carry less weight, for example, because they have to be proved perhaps years after the event, based only on testimony which may be affected by faded memories and the forces of contemporaneous litigation."). However, even if an opinion incorrectly concludes that an infringer would not be liable for infringement, such opinion will mitigate enhanced damages if it is found to be competent. *Johns Hopkins Univ. v. CellPro, Inc.,* 152 F.3d 1342, 1364 (Fed. Cir.1998).

The January 27, 2000 letter sent by NTP to RIM (the "Notice Letter") listed six patents owned by NTP and referred to a "distinct commercial advantage" available to RIM if it entered into a licensing agreement with NTP.[1] The letter also included the following statement: "As you are aware, the patent laws cover direct infringement, contributory infringement, and inducement to infringe." Finally, the letter included documentation regarding the BlackBerry Desktop Software Installation Guide, the Getting Started Guide, and the BlackBerry solution. RIM adduced evidence that, upon receipt of the Notice Letter sometime during the first week of February 2000, some investigation was done by Charles Meyer with the assistance of in-house patent attorney Krishna Pathiyal, Director of Wireless Innovation Gary Mousseau, and Chief Executive Officer Mike Lazaridis. Both Lazaridis and Mousseau provided "technical assistance" to Meyer and Pathiyal as to how RIM's

products worked. As part of his investigation, Meyer performed research to find out who NTP was, read the patent specifications, and reviewed all independent claims of each patent to see if RIM was somehow violating the patent. During the course of his investigation, Meyer met with Lazaridis three or four times and gave Lazaridis two oral reports that were not reduced to writing, because, as he surmised, "there was no need" to reduce them to writing. As a result of this investigation, Meyer concluded that, because one element of all the independent claims was missing, none of RIM's products infringed the six patents identified by NTP in the Notice Letter. On February 27, 2000, Meyer then sent a response to NTP (the "Response Letter") where he asked for more time to complete RIM's "due diligence," and he requested that NTP send a copy of the claims of the pending patent application as well as other documentation that led NTP to believe that RIM should take a license with respect to the Campana Patents. Meyer testified that, from the time he received the Notice Letter to the time he sent the Response Letter, he spent approximately 40 hours researching the patents. Meyer further testified that he spent an additional 10–20 hours with Lazaridis and Pathiyal discussing the patents.

Based on the evidence advanced at trial, it is difficult to determine whether RIM actually conducted any investigation at all. There were inconsistencies in the testimony of Charles Meyer, Krishna Pathiyal, Mike Lazaridis, and Gary Mousseau as to the amount of time spent investigating the Campana Patents, and who was involved in the investigation. Other circumstances that contributed to the doubt that any investigation was conducted include the demeanor of the witnesses, and the lack of

---

**1.** The following patents were listed in the Notice Letter: U.S. Patent Nos. 5,631,946; 5,625,670; 5,479,472; 5,438,611; 5,436,960; and 5,819,172.

any documentation of any aspect of the investigation whatsoever. For example, Charles Meyer's explanation concerning the failure to write notes on the face of the patents was implausible. Meyer's explanation was further undermined when he testified that, instead of writing on the patents, he took notes regarding the patents on separate sheets of paper, but later testified that he failed to locate any of those notes. Moreover, RIM could not locate its copy of the Notice Letter.

In any event, assuming that RIM conducted an investigation, it was not sufficient to meet its required duty of care because Meyer's oral opinion was not competent. A reasonably prudent person under these circumstances would not have confidence that a court would render a finding of non-infringement or invalidity. First, Neither Meyer nor Pathiyal were outside counsel. *See Read,* 970 F.2d at 829 (reversing finding of willful infringement where defendant obtained two independent opinions from different patent counsel). Therefore, it was more likely that any opinion issued by them would not be objective. Second, Meyer did not conduct a study of invalidity, order a copy of the prosecution history of the patents, or conduct a search of prior art. *See Datascope,* 879 F.2d at 828. In addition, Meyer used both Lazaridis and Mousseau, interested parties, as technical resources. *See Minn. Mining,* 976 F.2d at 1581 (affirming enhanced damages where investigating counsel obtained information about the practiced art not from an independent expert, but from an entity with a stake in the litigation).

RIM, apparently wary of the sufficiency of Meyer's investigation, sought to diminish the effectiveness of the Notice Letter, by asserting that the letter was not sufficient notice to trigger a duty of care.[2] RIM's argument here is not persuasive. On one hand, Meyer testified that he did not construe the letter to be a notice of infringement. However, Meyer then testified that he performed an investigation regarding infringement to gain an understanding as to why NTP wanted them to take a license. When asked why he performed the investigation, he stated that it would be prudent to do so. Meyer's own testimony demonstrates that the Notice Letter had a dual purpose: (1) to give notice of its patents and RIM's potential infringement of those patents to RIM; and (2) to invite RIM to take a license of those patents. At that time, it was obviously to NTP's business advantage to invite RIM to take a license with NTP as opposed to sending a threatening cease-and-desist letter. RIM's attempt to latch on to what it did in terms of investigation after the suit was filed does not have any bearing on what it did prior to that time. The initiation of litigation forced RIM to thoroughly evaluate the Campana Patents as a matter of course.

RIM's investigation, as conducted by Meyer was inadequate. Consequently, Meyer's oral opinions were not competent, as they were conclusory, based on insufficient information, and not objective. Con-

2. It should be noted that the Notice Letter referred only to three of the patents that RIM was found to infringe—the '960, '172, and '670 Patents—but not the '451 or the '592 Patents. While RIM argues that this should mitigate an award of enhanced damages, if it conducted an adequate and continuing investigation of the patents in the Notice Letter, it would have discovered that the '451 Patent, dated May 23, 2000, is a continuation of the '960, '172, and '670 patents which are all listed in the Notice Letter. Likewise, the '592 Patent, dated November 11, 2001, is a continuation of the '451 Patent. Moreover, the Notice Letter referred to a "relevant continuing patent application," which RIM acknowledged in its Response Letter.

sequently, RIM's reliance on these opinions did not satisfy their duty of care.

### 3. RIM's Litigation Behavior

RIM consistently engaged in a variety of questionable litigation tactics throughout the course of this action. RIM's method of conducting discovery including its trickling of the delivery of documents, its failure to work with NTP to streamline document production, and its last-minute cancellation of a deposition scheduled to be taken in Waterloo, Ontario, made discovery unnecessarily arduous. Furthermore, RIM's decision to file premature motions for summary judgment before claim construction, and numerous summary judgment motions after construction, which essentially challenged the claim construction, was both wasteful of judicial resources and unduly burdensome to NTP. Along the same lines, RIM continued to improperly challenge the claim construction with the attempted proffering of Larry Nixon as an expert witness. The primary purpose of this testimony was to adduce evidence as to the perceived incorrect claim construction. Finally, RIM attempted to confuse and mislead the jury by conducting a demonstration of the TekNow! system which RIM asserted as prior art, by using updated software that did not exist at the time the system was used.

Accordingly, taking all these circumstances into consideration, RIM's litigation behavior was sufficiently egregious to be considered an enhancing factor.

### 4. RIM's Size and Financial Condition

As RIM repeatedly acknowledged throughout its pleadings and its closing argument, NTP is a very small corporation, while RIM, in comparison, is a much larger entity. Thus, the primary consideration of this Court is the amount of enhanced damages that RIM can withstand. *Read* 970 F.2d at 827 (citation omitted).

Such damages should not be awarded if it would severely affect the defendant's financial condition or unduly prejudice the defendant's non-infringing business. *Id.* (citations omitted). NTP argues that RIM received three billion dollars from investors, and according to co-CEO Jim Balsillie, the damages awarded by the jury represents a "small percentage" of RIM's cash reserves. RIM does not dispute that this statement was made, but instead focuses on other aspects of its financial condition. For example, RIM asserts that, on December 19, 2002, it reported a net loss of $92.3 million dollars for that quarter. RIM also asserts that $23.1 million represents a third of RIM's total revenue for its most recent fiscal quarter. RIM asserts that, as a result of its losses, it has had to announce employee layoffs. RIM surmises that, if damages are enhanced, it will result in larger losses and more layoffs.

The evidence established that the Black-Berry line of products is the core of RIM's business. Consequently, there will be little prejudice to RIM's non-infringing business. RIM will not be allowed to focus solely on its revenue and net loss on one hand, while discounting its considerable investment pool on the other. RIM is large enough to withstand enhanced damages in this case.

### 5. Closeness of the Case

Enhanced damages should not be awarded if the defendant puts forth a "meritorious good faith defense and a substantial challenge to infringement." *Delta–X Corp.*, 984 F.2d at 413. A case is close if it was "hard-fought" or the jury could have found for the defendant on the issues of infringement, validity, and willfulness, and could have awarded substantially less damages. *Riles v. Shell Exploration and Prod. Co.*, 298 F.3d 1302, 1314 (Fed. Cir.2002).

RIM argues that it raised substantial arguments with respect to claim construction, including whether the preambles of the claims were limiting; the meaning of the term "originating processor"; whether the RF receiver and a destination processor can be a single device; whether certain claims require dual pathways; and the significance of the "in association with" and "responding to" limitations. RIM also asserts that it presented numerous prior art references such as ALOHAnet, the Zabarsky Patent, and the TekNow! system. However, in light of the fact that many of RIM's failed motions for summary judgment were aimed at challenging claim construction, RIM's argument here carries little weight. Moreover, RIM was not successful on any of its eight motions for summary judgment. RIM's infringement was clear. Indeed, it offered no real defense to NTP's infringement case at trial. RIM's evidence at trial further demonstrated that RIM's anticipation and obviousness defenses were not substantial. For example, Dr. Jeffrey Reed, RIM's own expert, was not able to correlate any piece of prior art to the specific elements and limitations of the asserted claims. Therefore, because RIM did not put forth a "meritorious good faith defense," or a "substantial challenge to infringement," this was not a close case.

#### 6.  Duration of RIM's Misconduct

NTP asserts that enhanced damages are appropriate due to RIM's infringement for well over three years, including two in which RIM willfully infringed the Campana Patents. RIM argues that the relevant period of any misconduct should be from the time this lawsuit was initiated until May 12, 2002, when it received its first oral opinion from Larry Nixon. NTP also notes that RIM continues to infringe the Campana Patents as evidenced by Chief Financial Officer Dennis Kavelman's statement during a post-verdict telephone con-

ference that RIM's "products are unchanged." (NTP App. A, at 6.)

Under these circumstances, the duration of RIM's infringing activities was not so egregious to constitute an enhancing factor. However, the duration was too long to be mitigating. Therefore, this factor is neutral.

#### 7.  Remedial Action Taken by the Defendant

NTP asserts that, in light of Kavelman's assertion that RIM's products are "unchanged," that it has not undertaken any remedial action whatsoever. RIM counters this by stating that it is working on designing around the Campana Patents. (Lazaridis Decl. ¶ 7.) However, RIM noted that such efforts have not been successful thus far. RIM's failed effort to design around the Campana Patents is not sufficient to constitute remedial action because it does not benefit NTP, the owner of the infringed patents, in any way. It is undisputed that, as of the conclusion of the trial, RIM has not engaged in any remedial action designed to benefit NTP by reducing RIM's infringing activities. Accordingly, RIM's failure to engage in such remedial action constitutes an enhancing factor.

#### 8.  Motivation for Harm

RIM had no motivation to harm NTP, and NTP concedes this point. Therefore, this is a basis for mitigating enhanced damages.

#### 9.  Concealment of Misconduct

Again, there is no evidence that RIM attempted to conceal any misconduct, and NTP concedes this. Therefore, this is also a basis for mitigating enhanced damages.

Based on the preceding discussion of the Read factors, enhanced damages are warranted in this case. However, RIM's con-

duct is not so egregious to warrant treble damages. Accordingly, the qualifying compensatory damages, as awarded by the jury, will be enhanced by a factor of 0.5. NTP has also asked this Court to enhance post-verdict compensatory damages. As discussed earlier, RIM has not taken any remedial measures to decrease its infringing activities. In fact, shortly after receiving an unfavorable jury verdict, it publicly announced that its products will remain "unchanged." Furthermore, it has stipulated to the infringement of four new models of BlackBerry handheld devices which it fully intends to market and sell. Therefore, there is a sufficient basis to enhance post-verdict damages. Accordingly, the post-verdict compensatory damages will also be enhanced by a factor of 0.5.

### B. Attorney's Fees

As a general rule, absent statutory authority, a "prevailing litigant is ordinarily not entitled to collect a reasonable attorneys' fee from the loser." *Alyeska Pipeline Service Co. v. Wilderness Society,* 421 U.S. 240, 247, 95 S.Ct. 1612, 44 L.Ed.2d 141 (1975). In patent infringement suits, district courts "in exceptional cases may award reasonable attorney fees to the prevailing party." 35 U.S.C. § 285 (2000). The purpose of this section is to award attorney fees in extraordinary cases where there is:

> [A] finding of unfairness or bad faith in the conduct of the losing party, or some other equitable consideration of similar force, which makes it grossly unjust that the winner of the particular law suit be left to bear the burden of his counsel fees which prevailing litigants normally bear.

*Machinery Corp. of America v. Gullfiber AB,* 774 F.2d 467, 471 (Fed.Cir.1985).

■ When considering a request for attorney fees under § 285, "the trial judge undertakes a two-step inquiry: he or she must determine whether there is clear and convincing evidence that the case is 'exceptional,' and if so, whether an award of attorney fees to the prevailing party is warranted." *Interspiro USA, Inc. v. Figgie Int'l Inc.* 18 F.3d 927, 933 (Fed.Cir. 1994). The first step is a question of fact reviewed for clear error. The second is within the discretion of the trial judge and is reviewed for abuse of discretion. *Id.* at 933–34. The two steps are interrelated, as "the amount of the attorney fees depends on the extent to which the case is exceptional. In other words, the exceptionality determination highly influences the award setting." *Special Devices, Inc. v. OEA, Inc.,* 269 F.3d 1340, 1344 (Fed.Cir.2001).

■ An express finding of willfulness provides a sufficient basis for the award of attorney fees. *Amsted Indus., Inc. v. Buckeye Steel Castings Co.,* 24 F.3d 178, 184 (Fed.Cir.1994). To that end, "[a]s a general rule, attorneys fees under section 285 may be justified by any valid basis for awarding increased damages under section 284." *Jurgens,* 80 F.3d at 1573 n. 4. Additional factors which may make a case exceptional include: actual wrongful intent or gross negligence, *Machinery Corp.,* 774 F.2d at 473 ("The gross negligence standard has been defined as requiring willful, wanton, or reckless misconduct, or evidence of 'utter lack of all care.'"); the closeness of the case and the parties' conduct, including evidence of bad faith, *Interspiro USA,* 18 F.3d at 934; misconduct during litigation, fraud, and vexatious or frivolous litigation, *Bayer Aktiengesellschaft v. Duphar International Research B.V.,* 738 F.2d 1237, 1242 (Fed.Cir.1984); inequitable conduct, *J.P. Stevens Co., Inc. v. Lex Tex Ltd., Inc.,* 822 F.2d 1047, 1050 (Fed.Cir.1987); and whether it would be grossly unfair for the prevailing party to bear the cost of litigation, or where the conduct of the losing party is marked by

bad-faith or unfairness, *Interspiro USA., Inc. v. Figgie Int'l,* 815 F.Supp. 1488, 1521 (D.Del.1993), *aff'd,* 18 F.3d 927 (Fed.Cir. 1994).

■ If this Court decides that this is an exceptional case, it must be determined "whether an award of attorney fees to the prevailing party is warranted." *Interspiro USA,* 18 F.3d at 933. Courts may consider the litigation behavior of both the infringer and the patentee. *Motorola Inc. v. Interdigital Tech. Corp.,* 121 F.3d 1461, 1465 (Fed.Cir.1997). To that end, "the trial judge is in the best position to weigh considerations such as the closeness of the case, the tactics of counsel, the conduct of the parties, and any other factors that may contribute to a fair allocation of the burdens of litigation as between winner and loser." *Modine Mfg.,* 917 F.2d at 543. In any event, an award for attorney's fees must be reasonable. *Gentry Gallery, Inc. v. Berkline Corp.,* 134 F.3d 1473, 1480 (Fed.Cir.1998).

■ Although the moving party must show that attorney fees are warranted, in the face of the jury's express finding of willful infringement, which, standing alone, is a sufficient basis to award attorney's fees, RIM must put forth a showing as to why attorney fees are not warranted in this case. RIM argues that this is not an exceptional case by asserting the closeness of the case, its own good faith defenses, and NTP's litigation conduct.[3] However, based on the discussion of the *Read* factors, it is clear that this is an exceptional case. Again, there is substantial doubt as to whether any investigation of the Campana Patents occurred upon receipt of the Notice Letter. Even if an investigation was conducted, it was not sufficient to meet its duty of care. RIM's litigation behavior, including its discovery tactics, post-trial motions which rehashed issues previously dealt with on summary judgment, its attempt to advance evidence through an expert that the claim construction is erroneous, and its fraudulent demonstration of the TekNow! system with updated software installed by Gary Mousseau, also adds to the exceptionality of this case. Moreover, as discussed earlier, this was not a close case. Therefore, there is clear and convincing evidence that this case is sufficiently exceptional to warrant an award of attorney fees.

■ RIM advances a compelling argument regarding the difference between the number of patents and claims that NTP asserted in the beginning of the litigation, and the number asserted at trial. RIM notes that when NTP filed suit, it claimed infringement of eight patents having a combined total of over 2,400 claims. RIM further notes that NTP initially refused to limit the number of claims, first filing a "conditional" reduction of the asserted claims to 1,300, then to 500 shortly before the *Markman* hearing. Upon motion by RIM to compel NTP to further reduce its claims, the number of asserted claims was reduced to thirty-one. That number was finally reduced to sixteen claims on the eve of trial.

RIM argues that the fees requested do not bear any reasonable relation to the small portion of litigation in which NTP prevailed. Here, RIM argues that a substantial portion of the fees accumulated by NTP are related to numerous claims that were ultimately not asserted at trial. RIM argues that, because NTP ultimately pursued the infringement of only sixteen claims, it should be considered the prevail-

---

**3.** The Court notes that RIM devotes some time discussing the re-examination of the Campana Patents in an effort to argue the closeness of this case. However, the re-exam-ination of the patents have no bearing on the closeness of the issues advanced before this Court.

ing party. RIM equates NTP's decision not to pursue most of its asserted claims as a dismissal of an action in which the defendant prevails. Though RIM's argument with respect to being the prevailing party is a stretch, its assertion that a portion of NTP's attorney fees are based on claims that were not asserted at trial, is persuasive, and indicates a need to adjust NTP's award of attorney fees accordingly.

Although RIM asserts that the substantial amount of NTP's attorney fees were derived from claims that were not asserted at trial, the Court finds that the vast majority of NTP's fees were accumulated by other aspects of litigation including discovery, expert witness fees, trial preparation, traveling expenses, as well as time spent briefing its opposition memoranda to RIM's numerous motions for summary judgment, advancing motions in limine to prevent the improper testimony of certain witnesses, and briefing its opposition memoranda to RIM's post-trial motions which sought to relitigate claim construction issues. Therefore, NTP will be awarded attorney fees in this case. However, in light of the fact that NTP slowly whittled down many of the asserted claims throughout the course of the case up until the eve of trial, it is appropriate to reduce the amount of this award. This Court, however, cannot determine to a mathematical certainty the portion of NTP's fees that was devoted to litigating claims that were not asserted. In any event, because NTP accumulated a majority of its fees with respect to other aspects of litigating the case, this Court will reduce NTP's award of attorney fees by 20%.

### III.

■ NTP has also filed a motion for prejudgment and postjudgment interest. RIM does not oppose the award of postjudgment interest. RIM also does not oppose the award of prejudgment interest, or NTP's assertion that such interest should be compounded quarterly. RIM, however, disputes the award of prejudgment interest with respect to the appropriate interest rate. Therefore, the only remaining dispute with respect to prejudgment interest, is whether NTP should be awarded the prime rate of interest or the T-bill rate, as advanced by RIM.

■ Prejudgment interest is awarded pursuant to 35 U.S.C. § 284. The relevant language of that section states that "[u]pon finding for the claimant the court shall award the claimant damages adequate to compensate for the infringement, but in no event less than a reasonable royalty for the use made of the invention by the infringer, together with interest and costs as fixed by the court." *Id.* "[P]rejudgment interest should ordinarily be awarded where necessary to afford the plaintiff full compensation for the infringement." *General Motors Corp. v. Devex Corp.,* 461 U.S. 648, 654, 103 S.Ct. 2058, 76 L.Ed.2d 211 (1983). Such interest must be applied only to the compensatory damages, not enhanced or other punitive damages. *Underwater Devices,* 717 F.2d at 1389. A finding of infringement does not necessarily mandate an award of prejudgment interest. *General Motors,* 461 U.S. at 656, 103 S.Ct. 2058. Accordingly, the determination of whether such interest is warranted, and the rate of interest, is within the ambit of the court's discretion. *Kaufman Co. v. Lantech, Inc.,* 926 F.2d 1136, 1144 (Fed.Cir.1991). This discretion includes the method of compounding. *Datascope Corp.,* 879 F.2d at 829. Typically, "an award of prejudgment interest is necessary to ensure that the patent owner is placed in as good a position as he would have been in had the infringer entered into a reasonable royalty agreement." *General Motors,* 461 U.S. at 655, 103 S.Ct. 2058.

NTP asks the Court to apply the prime rate. The prime rate is the interest rate

charged by banks to their most creditworthy customers. The rate is almost always the same among major banks. The prime rate adjusts with changes by the Federal Reserve Board. RIM argues that using the prime rate would be punitive and asserts that it would be more appropriate for the Court to apply the one-year U.S. Treasury bill rate. Treasury bills are short-term securities that mature in one year or less from their issue date. Treasury bills are purchased for a price less than their face value, and when they mature investors may tender them for their face value. The interest is the difference between the purchase price and what is paid by the U.S. Treasury at maturity.

District courts, in their discretion, have selected various rates, including the prime rate, the prime rate plus a percentage, the U.S. Treasury bill rate, the state statutory rate, corporate bond rates, a set consumer credit rate, the rate the patentee actually paid for borrowed funds, and the rate the patentee actually earned on spare cash. 7 Donald S. Chisum, *Chisum on Patents* § 20.03[4][a][v] (2002). NTP asserts that the prime rate is a fair rate for the use of its money. RIM, asserts that the purpose of prejudgment interest is to ensure that the patent owner is placed in as good a position as he would have been had the infringer entered into a reasonable royalty agreement, and thus, the prime rate will result in an excessive award. RIM argues that the one-year U.S. Treasury bill rate is sufficient to adequately compensate NTP.

To ensure that NTP is placed in as good a position as it would have been in had RIM entered into a reasonable royalty agreement, prejudgment interest will be calculated at the prime rate. Prejudgment interest will apply to compensatory damages only, and will not apply to attorney fees. The prime rate, compounded quarterly, is a conservative, middle-of-the road approach that takes into account normal market fluctuations. Thus, it more adequately places NTP in as good a position as it would have been in had RIM taken a license with NTP. The one-year U.S. Treasury bill rate is too low to accomplish this.

## IV.

Accordingly, Plaintiff's Motion for Enhanced Damages and Attorney Fees is GRANTED in part, and DENIED in part. The qualifying compensatory damages, as awarded by the jury, and post-verdict compensatory damages·shall be enhanced by a factor of 0.5. NTP shall be awarded attorney fees, and that award is to be reduced by 20%. As stated in this Court's March 11, 2003 Order, Plaintiff's Motion for Prejudgment and Postjudgment Interest is GRANTED. However, prejudgment interest will not be applied to attorney fees.

An appropriate Order shall issue.